**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| TIG Insurance Company, a California Corporation, | ) ) ) | |
| Plaintiff, | ) ) | **ORDER GRANTING, IN PART, PLAINTIFF'S MOTION FOR** |
| vs. | ) ) | **SUMMARY JUDGMENT** |
| Chapman and Chapman, P.C., Charles Chapman, and Aruna Seth, | ) ) ) | Case No. 1:05-cv-024 |
| Defendants. | ) ) | |

Before the Court is plaintiff TIG Insurance Company's Motion for Summary Judgment filed on March 30, 2006. For the following reasons, the motion is granted, in part.

**I.      BACKGROUND - THE UNDERLYING LAWSUIT**

This dispute stems from an underlying legal malpractice action filed by Aruna Seth against attorney Charles Chapman and the law firm of Chapman and Chapman, P.C (collectively referred to as "Chapman"). Seth filed suit in North Dakota state court on March 6, 2002. Seth alleged that Chapman committed legal malpractice in connection with certain investments she made in a limited liability partnership known as North Star Management Limited Partnership ("North Star Management"). The plaintiff, TIG Insurance Company ("TIG"), is Chapman's legal malpractice carrier.

The original complaint alleged that Chapman was responsible for Seth's loss of $750,000 she invested in North Star Management. The underlying action alleges that Chapman was negligent in failing to disclose certain facts to Seth during two meetings with Sanjay Patel, a representative of North Star Management, which resulted in her investment and losses. The first meeting is alleged

to have taken place on March 18, 1999. At this meeting, Seth alleged that based on Chapman's negligence, she was convinced by Patel to invest $450,000 in North Star Management, which was to have purchased a Country Inn Suites Hotel. Seth's investment was to result in her having a 25% interest in the hotel. The second meeting is alleged to have taken place in March 2000. At this meeting, it is alleged that Chapman was negligent in allowing Patel to make misrepresentations that resulted in Seth contributing an additional $300,000 to the hotel project.

TIG received notice of the Seth action on March 6, 2002, when notice was sent to the claims administrator for TIG. At Chapman's recommendation, TIG retained attorney John Petrik to defend Chapman in the underlying action. Petrik was the only defense counsel of record for Chapman in the action at all times including up to the execution of the purported Miller-Shugart settlement agreement.

In late spring of 2004, Seth filed an amended complaint against Chapman. The amended complaint contained allegations similar to those in the original complaint but amended the action to allege claims of securities fraud against Chapman. TIG subsequently issued a reservation of rights letter based on the claims asserted in the amended complaint.

On January 11, 2005, the state court ruled on Chapman's motion for summary judgment and held that Chapman was not Seth's attorney at the time of the first transaction involving the sum of $450,000. The state court held that Seth's statutory securities fraud claim could stand. A motion to reconsider the ruling on the securities fraud claim was filed by Chapman. On February, 5, 2005, the state court affirmed its January 11, 2005, ruling and also permitted Seth to file a claim for common law fraud against Chapman in addition to the securities fraud claim. On February 8, 2005, Seth filed a second amended complaint which added an allegation of common law fraud.

2

Surprisingly, all of this activity occurred less than a week before the start of the trial in state court.

The trial in state court was set to begin in mid-February of 2005. On January 17, 2005, Chapman's defense attorney, John Petrik, provided TIG with a pre-trial assessment of the settlement value of Seth's claims. Petrik indicated that the potential range of verdict could be between $0-$300,000 plus interest which may increase up to $750,000 plus interest if the fraud/deceit claims were added in a second amended complaint. Petrik indicated that there was a 30-40% chance of a verdict for Seth of $100,000 or less, and there was less than a 10% chance of a verdict in excess of $250,000.

Based on defense attorney Petrik's analysis, TIG authorized Petrik to initiate a settlement offer of $30,000 to Seth's counsel. Seth's counsel, Irvin Nodland, rejected TIG's offer on January 26, 2005. On January 28, 2005, Chapman's personal attorney, Orell Schmitz, wrote a letter to defense counsel Petrik concerning Petrik's evaluation of the malpractice claim.

On February 2, 2005, Schmitz sent a letter regarding Petrik and TIG's evaluation of the claim and expressed the opinion that an offer in the range of $250,000- $300,000 may resolve the dispute. On February 8, 2005, Chapman forwarded the letter to TIG stating that he believed Petrik had underestimated the settlement value of the case. Also, on February 8, 2005, TIG authorized Petrik to offer $100,000 to Seth to settle the matter. Seth's counsel rejected the offer but indicated that $500,000 could resolve the claim. Seth made no formal counter-demand. Finally, on February 8, 2005, TIG's counsel sent a letter to Chapman, Petrik, and Schmitz informing them that "TIG remains committed to making every good faith effort to resolve this dispute. At this time, TIG continues to await the Plaintiff's [Seth's] response to TIG's latest settlement offer of $100,000."

On February 9, 2005, at 8:21 a.m., attorney Schmitz wrote to TIG's counsel and advised as follows:

> Thanks for the letter. I have previously advised the company that it will take $250,000-$350,000 to get this matter settled. It is now crunch time. If the company is going to make a realistic attempt to settle it has to be done today. I am unavailable all day tomorrow. Feel free to give me a call if you think it is necessary.

See Exhibit 47 (Docket No. 59-49).

On February 9, 2005, at 10:39 a.m., TIG's counsel responded to Schmitz's e-mail, stating as follows:

> TIG has been advised by Mr. SCHMITZ that the current demand is $500,000. Mr. SCHMITZ has also advised that in his opinion the case can be settled for between $250,000 and $350,000. This opinion appears to be in line with Mr. Petrik's earlier opinions concerning the settlement value of this matter.
>
> TIG considers the resolution of this matter of utmost importance. TIG considers Mr. Schmitz's range stated above to be realistic. However, at this time, TIC does not want to jump to the levels suggest[ed] by Mr. SCHMITZ in his e-mail. That being said, TIG authorizes Mr. Petrik to offer $150,000 to Plaintiff as soon as possible.
>
> Additionally, TIG invites Mr. Chapman to consider any contribution, if he feels it will help this case settle. Again, TIG recognizes that Mr. Chapman is under no obligation to contribute to any settlement but, given the coverage concerns and nature of the claims, TIG invites Mr. Chapman to consider whether any such consideration, no matter the size, may help resolve this matter.
>
> Finally, three housekeeping issues: (1) TIG has not received Mr. Chapman's written authorization to settle this matter, TIG needs this as soon as possible; (2) TIG wants to remind Mr. Chapman that he remains responsible for the $2,500 deductible should the case be resolved and (3) there appears to be a communication issue at this time as TIG did not receive the Plaintiff's counter-offer until this morning. TIG must be advised of all developments immediately so it can respond in a timely manner.
>
> If you have any questions, please contact me.

See Exhibit R (Docket No. 41-34).

4

Seth rejected the $150,000 offer prior to 2:00 p.m. on February 9, 2005. Seth indicated that $500,000 could settle the case but made no counter-demand. On February 10, 2005, at 10:21 a.m., TIG was advised by defense counsel Petrik that Seth had not responded to the request for a settlement demand. Petrik informed TIG that, in his opinion, given the state court's ruling on the securities law issues which Petrik felt "strongly" incorporated a "serious error of law in allowing any securities claim to go forward," Chapman faced potential exposure of $1 million. Petrik concluded that the case against Chapman was defensible.

On February 10, 2005, at 12:51 a.m. CST, TIG's counsel wrote Petrik stating:

> Please let this letter respond to your e-mail and attached report received earlier today. It is TIG's present understanding that your current position is that this claim is worth up to $750,000 plus interest should it go to verdict. Are the points you raised in your Motion to Reconsider the court's ruling on the securities issues still valid or are you now disavowing those arguments?
>
> Yesterday, TIG was advised by both you and Orell SCHMITZ that this claim had a settlement value of between $250,000 and $350,000. As you are aware, based on this stated settlement value provided by you and Chapman's personnel (sic) counsel, TIG increased its settlement offer to $150,000. To our knowledge, no response to this offer has been presented by Plaintiff's counsel. In fact, we understand that the reported $500,000 reduced demand was never a demand but instead was subsequently termed a flippant remark.
>
> Given all of this, what is your recommendation on how TIG and the insured can proceed to negotiate the resolution of this claim. In particular, is it your recommendation that TIG increase its current offer or do you suggest we wait for a response from the claimant.
>
> I look forward to you prompt reply.

See Exhibit 53 (Docket No. 59-55).

On February 10, 2005, at 12:57 a.m., Chapman wrote TIG's counsel directly, stating:

> Orell is out of town at trial today. I just talked to him on his noon break, and he specifically authorized me, upon my request, to make this direct contact. I have been

included in all communications to date anyway, and I am fully aware of the circumstances.

I just received David Larson's [TIG counsel] Feb 10, 2005, 12:51 p.m. email.

Right now, I think that we are all wanting to head in the same direction . . . i.e., settlement.

I am simply worried that right now we are at a stalemate. John's [Petrik] last email simply said that he had not yet heard from Nodland. My concern is, what if Nodland thinks that he is waiting for us. I would hate to lose a change to settle in that way. Therefore, I do ask that we make contact with Nodland immediately to see the status. Further, I am concerned that we don't have much time to, in David Larson's words, "jump to the levels" of negotiations suggested by Orell [SCHMITZ]. Please understand that it is simply more difficult to see negotiation strategy, when you are, as I no am, on this side of the desk.

In my mind, we need to make a jump this afternoon. I have been asked to voluntarily become part of the solution; as I seriously consider that option, I need to know where we are headed with negotiations. Personally, I fear that we are running out of time. Thanks for understanding my concerns.

See Exhibit X (Docket No. 41-40).

On February 10, 2005, at 1:43 p.m. CST, TIG's counsel responded to Chapman stating:

TIG has made an offer and is prepared to make every effort to resolve the dispute. At this time, like you, TIG is waiting to hear from both Plaintiff's counsel and your attorney in this matter, Mr. Petrik. TIG cannot respond appropriately until it hears from either individual.

See Exhibit T (Docket No. 41-36).

On February 10, 2005, at 2:12 p.m., Petrik responded to TIG counsel's earlier e-mail stating:

I am not disavowing what I put in the motion for reconsideration. I still think we have a very good case to appeal, it we get popped.

The purpose of the updated report/email was to point out the confusion at the trial court level as to what law the court is applying in this case and to point out that my concern about a major verdict has probably increased from 10% in my pretrial report to 25%. Thus I do not disagree that settlement value is in the range you indicate.

6

> I still think a jury, it they learn all the facts will not attribute more that 30% of the fault to Casey and a defense verdict is possible if Jay Patel does a good job.
>
> However, the jury will be instructed that they have to follow the law, and if they are told that under the law, 10-04-17, that the plaintiff "shall recover" her investment, interest and attorneys fees, and the only part of 10-04-17 that doesn't apply is the "joint and several," we are in trouble because, as we discussed, David, the practical effect is joint and several liability anyway. On the other hand, if the instructions say that they can only award damages proximately caused by Casey, we should be ok. I think you can argue either interpretation from the Order. Thus, our dilemma.

See Docket No. 1, ¶ 44.

On February 10, 2005, at 2:55 p.m., TIG's counsel wrote to Chapman concerning the settlement efforts:

> As you can see from my prior e-mail (of about 20 seconds ago) TIG has authorized Mr. Petrik to offer $200,000 in an effort to resolve this claim. If more is needed, we have advised John that TIG will continue to negotiate. If you want to increase the $200,000 offer with your assets for the uncovered claims, please correspond with John and cc and TIG's representative, Jill Rohrback, who's (sic) e-mail address is included in the cc: of this correspondence.

See Exhibit Q (Docket No. 41-33).

On February 10, 2005, at 4:13 p.m., Petrik reported on his last conversation with Seth's attorney, Irv Nodland:

> I talked to Nodland. He said he had gone home sick, although I'm pretty sure he holes up at home to do trial prep.
>
> I conveyed the $200K offer and told him that we have more but we weren't moving if he wasn't moving. That didn't seem to surprise him.
>
> I also told him and Judge Mattson about Frommelt's surgery. I told them we may have to make a motion for continuance, but Nodland and I will talk in the morning if there is a way to address this issue without a continuance. I anticipate that is when Nodland will reply on the settlement discussion as well.

See Docket No. 1, ¶ 46.

7

Seth's attorney, Irv Nodland, did not respond until 7:13 a.m. the next day, February 11, 2005. Petrik received an e-mail when he arrived in the office shortly after 9:00 a.m. Nodland's response reads as follows:

> I was able to reach Aruna last evening and as a result of my discussion with her I am withdrawing all previous offers except the offer to settle for policy limits. I assume we will need to talk later this a.m. but also assume our settlement discussions are over.

On February 11, 2005, and before Petrik could respond, he received the purported Miller-Shugart settlement agreement which was faxed to his office around 9:50 a.m. On February 11, 2005, Chapman and Seth had entered into a Miller-Shugart settlement agreement and a stipulated judgment which provided in relevant part as follows:

> Resolution of Legal Malpractice and negligence allegations: To resolve allegations of legal malpractice and negligence made by Seth against Chapman, the parties agree a judgment of $1,000,000 may be entered against Chapman. Seth covenants and agrees that neither she nor any assign heir, or other entity acting by or through her shall ever have any right to levy, execute, or otherwise pursue collection of said judgment except such as may be the obligation of Chapman's professional liability insurance carrier pursuant to applicable policies of insurance. Seth agrees that his Judgment shall not operate as a lien on any property, real or persona, owned by Chapman. Chapman's responsibility is limited to any recovery Seth may make from Chapman's professional liability insurance carrier. All risks of such recovery lies solely with Seth. The covenants herein shall survive even if the Agreement is declared void for any reason.

See Settlement Agreement, Exhibit FF (Docket No. 41-48). June 28, 2006

TIG filed this action seeking a declaration of its rights and obligations under the "Lawyers Professional Liability Policy" issued to Chapman. TIG asserts that the Miller-Shugart settlement agreement is unenforceable as a matter of law for three reasons: (1) TIG did not receive the required notice prior to the execution of the Miller-Shugart agreement; (2) the amount of the stipulated judgment is unreasonable as a matter of law; and (3) Seth's claim is not covered by the TIG policy.

8

Seth responds by that asserting the agreement is enforceable against TIG and that the TIG policy covered the malpractice claim.

## II.     **STANDARD OF REVIEW**

It is well-established that summary judgment is appropriate when, viewed in a light most favorable to the non-moving party, there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Graning v. Sherburne County, 172 F.3d 611, 614 (8th Cir. 1999). A fact is "material" if it might effect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1376 (8th Cir. 1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed.R.Civ.P. 56(e). A mere trace of evidence supporting the non-movant's position is insufficient. Instead, the facts must generate evidence from which a jury could reasonably find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### III.     LEGAL DISCUSSION

####      A.     ENFORCEABILITY OF MILLER-SHUGART SETTLEMENTS

Miller-Shugart[1] settlements allow an insured defendant to stipulate to a settlement of claims asserted by a plaintiff and stipulate that judgment may be collected only from the proceeds of any insurance policy, with no personal liability to the defendant. D.E.M. v. Allickson, 555 N.W. 2d 596, 602 (N.D. 1996). A Miller-Shugart settlement is enforceable against an insurer if (1) the insurer received notice of the agreement; (2) the agreement is not the result of fraud or collusion; and (3) the agreement is reasonable. Sellie v. North Dakota Ins. Guar. Assoc., 494 N.W.2d 151, 155 (N.D. 1992). However, if an insurer has refused to defend and has abandoned its insured, notice is not required. D.E.M. v. Allickson, 555 N.W.2d 596, 602 (N.D. 1996). It is well-established that the plaintiff/judgment creditor bears the burden of establishing that a Miller-Shugart settlement is enforceable. Fisher v. American Family Mut. Ins. Co., 579 N.W.2d 599, 607 (N.D. 1998).

It is clear and undisputed that Chapman failed to give TIG notice that he was negotiating a Miller-Shugart settlement agreement. See Chapman's Answers to TIG Insurance Company's Requests to Admit, Nos. 7 and 8, Exhibit Y (Docket No. 41-41). Nevertheless, the defendant, Aruna Seth, asserts that the lack of notice does not invalidate the settlement agreement for several reasons: (1) TIG was not prejudiced by the failure to notify, (2) even though TIG provided a defense, it did so conditionally, (3) TIG failed to enter into reasonable settlement negotiations, (4) TIG abandoned Chapman, and (5) notice to TIG would have been an idle act. The Court finds that Seth's assertions are not supported by the record.

---

[1] Miller Shugart settlements are named after the seminal Minnesota case of Miller v. Shugart, 316 N.W.2d 729 (Minn. 1982). North Dakota recognized the use of such agreements in Medd v. Fonder, 543 N.W.2d 483 (N.D. 1996).

The record reveals a flurry of correspondence and communications between TIG, Chapman, and Seth regarding possible settlement offers and counter-offers, which continued up until the time Chapman and Seth entered into the Miller-Shugart agreement, which was on the eve of trial. See Exhibits O, P, Q, R, S, T, U, V, W, and X, dated January 26, 2005, to February 10, 2005 (Docket Nos. 41-31 to 41-40).  It is clear and undisputed that all of the parties were actively engaged in settlement discussions until February 10, 2005. There is no doubt that the parties placed different values on the value of Seth's claim.  See Exhibits N, O, and R (Docket Nos. 41-30, 41-31,and 41-34); Exhibits 32, 43, 52, and 56 (Docket No. 59-34, 59-45, 59-54, and 59-58 ).  However, the record establishes that TIG entered into reasonable settlement negotiations which were ongoing as the trial in state court quickly approached.

It is also undisputed that TIG continued to defend Chapman in the underlying legal malpractice action and did not abandon the insured.  See Chapman's Answers to TIG Insurance Company's Requests to Admit, No. 11, Exhibit Y (Docket No. 41-41).  The conflict that arose between Chapman and TIG is best described as a difference of opinion as to what strategy to take in defending the malpractice claim and the value of the underlying claim.  Such a difference of opinion does not rise to the level of abandonment.  Nor does TIG's reservation of rights constitute abandonment of the insured.  The Court finds as a matter of law that TIG did not abandon Chapman.[2]    In addition, Seth has failed to set forth any legal authority or basis for the proposition

---

[2] In its Memorandum of Support of its Motion for Summary Judgment, TIG asserts, in part, that Seth's claim did not trigger any coverage under the TIG policy because the policy was not retroactive. See Docket No. 40, p. 3-5, 15-19.  Seth asserts that TIG's assertion of denial of coverage based on retroactivity either gives an insured the right to enter into a Miller-Shugart agreement or excuses the failure to provide notice.  See Docket No. 58, p. 12. The record is devoid of any indication that TIG had voiced this interpretation of the policy at any time prior to the filing of its motion in this federal lawsuit.  The only evidence set forth by the parties demonstrates that as of October 15, 2002, TIG was not reserving its rights and that on January 10, 2005, TIG began to question coverage for the fraud claims. There is no evidence to indicate that either Chapman or Seth knew that TIG was alternatively interpreting the policy to deny all coverage at the time of the Miller-Shugart agreement.  Seth and Chapman could not have been

that an insurer must be prejudiced by the lack of notice before the settlement agreement can be invalidated. Although Seth cites to the case of North Star Mut. Ins. Co. v. Midwest Family Mut. Ins. Co., 634 N.W.2d 216 (Minn. App. 2001), that case did not involve a Miller-Shugart agreement and provides no support for the theory that TIG must be prejudiced by the lack of notice. As to the assertion that providing notice to TIG would have been an idle act, the Court finds the argument to be unsupported by the record and without merit.

After carefully reviewing the pleadings and exhibits and the entire record, the Court finds that Seth, the plaintiff/judgment creditor, has failed to meet her burden of proof. Seth has failed to demonstrate that the Miller-Shugart settlement agreement is enforceable as a matter of law. The undisputed evidence establishes that TIG was not provided with any notice that Chapman and Seth were negotiating a Miller-Shugart settlement agreement. TIG neither knew of the existence of the settlement agreement nor its terms until after it was signed by Seth and Chapman on the eve of trial. For this reason alone (failure to provide the insurer with notice of the Miller-Shugart settlement agreement), the Court finds that the Miller-Shugart agreement is void and unenforceable as a matter of law. At the time the settlement agreement was being negotiated, all of the parties were involved in ongoing settlement negotiations in an effort to resolve the dispute in the week prior to trial. A significant settlement offer had been conveyed by TIG just days before trial with the clear indication there was more settlement authority available. The timing of the Miller-Shugart agreement and the total lack of notice to the insurer renders the agreement void and unenforceable as a matter of law.

---

relying on TIG's recently articulated theory for denying coverage at the time they entered into the Miller-Shugart agreement. Thus, TIG's new theory would not excuse the failure to provide TIG with notice of the proposed Miller-Shugart agreement because, at the time of the agreement, TIG had conceded coverage for at least a portion of Seth's claims.

12

The Court finds it unnecessary to address TIG's remaining assertion that the Miller-Shugart settlement agreement was unreasonable.[3]

### B. COVERAGE ISSUES

#### 1. ALLEGED BREACH OF THE COOPERATION CLAUSE

TIG asserts that Chapman breached the cooperation clause of the insurance contract by executing the Miller-Shugart settlement agreement and entering into a stipulated judgment. Chapman denies that he breached the cooperation clause and asserts that he fully cooperated with TIG, at times to his detriment.

In North Dakota, it is well-established that "a breach of a cooperation clause by an insured will operate to relieve the insurer of liability under a policy." Wilson v. Farmers Ins. Group, 655 N.W.2d 414, 416 (N.D. 2003) (citations omitted); see also Steen v. Those Underwriters at Lloyds, London, 442 N.W. 2d 158, 162 (Minn. Ct. App. 1989) (citing Juvland v. Plaisance, 96 N.W.2d 537, 541-42 (1959) ("A breach of the cooperation clause which is material and prejudices the insurer can void coverage.")). A cooperation clause is generally regarded as a condition precedent, meaning no rights accrue under the policy until the condition is satisfied. Wilson, 655 N.W.2d 414, 416. To amount to a breach of a policy condition, an insured's lack of cooperation must be "substantial and material." Id. Generally, the question of whether the insured has violated his insurance policy by

---

[3]The record does reflect that the reasonableness of the Miller-Shugart agreement is questionable. The agreement set the settlement amount at $1,075,000, with policy limits of $1,000,000. The parties agreed that the final settlement demand made by Seth was $500,000 and the final counter-offer by TIG was $200,000 with a clear indication of additional settlement authority being available. See Exhibit 55 and 56 (Docket Nos. 59-57 and 59-58); see also E-mail from defense counsel, John Petrik, to TIG representative recounting discussion with Seth's counsel. Exhibit V, ( Docket No. 41-38) ("[I] told him [Seth's counsel] that we have more, but we weren't moving if he wasn't moving"). Nevertheless, the Court need not address the issue of the reasonableness of the settlement because the lack of notice to the insurer clearly supports a finding that the Miller-Shugart settlement agreement is unenforceable as a matter of law.

failing to cooperate with the insurer is a question of fact. However, when the evidence is such that reasonable minds could draw but one conclusion on the issue, the question of fact question becomes a question of law and may be ripe for summary judgment. Id.

The Defendant cites several cases for the proposition that when an insured fails to give the insurer notice of a Miller-Shugart settlement agreement, such action amounts to a breach of the cooperation clause, which in turn voids the underlying insurance policy and coverage. See Rodgers v. Missouri Ins. Guar. Assn., 841 F.2d 858 (8th Cir. 1988); Harisburg Area Community College v. Pacific Employers Ins. Co., 682 F.Supp. 805 (M.D. Pa. 1988); Coil Anodizers, Inc. v. Wolverine Ins. Co., 327 N.W.2d 416 (Mich. App. 1982). While illustrative, none of the cited cases involved a Miller-Shugart agreement. In fact, neither the parties nor the Court have discovered a case involving lack of notice which was deemed to equate with a breach of a cooperation clause in the context of a Miller-Shugart agreement. Simply stated, there is no known established precedent to suggest that such an alleged breach would, as a matter of law, render the insurance policy void and thereby alleviate the insurer's liability under the policy.

The Court expressly finds that there are genuine issues of material fact as to whether Chapman's actions, and the allegations of lack of cooperation with the insurer (TIG), amount to a "substantial and material" breach that equates with a breach of the cooperation clause which would void coverage under the circumstances. There are genuine issues of material fact in dispute as to whether the insured (Chapman) has violated the insurance contract by failing to cooperate with the insurer (TIG). Summary judgment is not appropriate at this stage of the litigation because there are genuine issues of material fact in dispute.

**2.    RETROACTIVE CLAUSE**

TIG also asserts that Seth's claims against Chapman were not covered by Chapman's legal malpractice policy because it did not fall within TIG's insuring agreement. TIG cites to the "Insuring Agreement" of the Policy, which provides in relevant part as follows:

1.    Coverages

   Professional Services and Personal Injury

To pay on behalf of the Insured all sums that the Insured shall become legally obligated to pay as Damages as a result of Claims first made against the Insured and reported in writing to the Company during the Policy Period . . . provided that such act, error, omission or Personal Injury occurs:

   A.    During the Policy Period; or

   B.    Subsequent to the Retroactive Date

      1.    The Insured did not notify any insurer under any prior Policy or policies of such act, error, omission or Personal Injury; and

      2.    Prior to the inception date, neither the Insured, nor any partner, shareholder, or the Insured's management committee knew or should have known that a wrongful act, error or omission or Personal Injury had occurred or had a reasonable basis to foresee that a Claim would be made against an Insured.

See TIG Policy, Exhibit H (Docket No. 41-24). Coverage under the renewed TIG policy began on October 2, 2000. TIG contends that because Chapman was aware of the potential claims of Seth prior to October 2, 2000, such claims are not covered.

Chapman responds by asserting that TIG provided malpractice coverage from October 2, 1999, through October 2, 2000, and the policy was renewed from October 2, 2000, through October 2, 2001. Chapman has acknowledged that he first received notice of a potential claim by Seth on or about July 2000. The record reveals that Chapman forwarded a letter to TIG on October 2, 2000,

along with notice of a potential claim. See Exhibit 2 (Docket No. 59-4). Under TIG's 1999-2000 malpractice policy, Chapman had 60 days after the expiration of the policy to notify TIG of a claim. See Exhibit H (Docket No. 41-24). Chapman contends that notice of the potential claim was provided under the 1999-2000 policy and also in the renewal application for the 2000-2001 policy. See Exhibit 2 (Docket No. 59-4). Chapman has directed the Court's attention to internal documents of TIG which clearly note that TIG regarded the Seth claim as falling within the coverage period of the 1999-2000 policy. See Exhibit 6 (Docket No. 59-8) (Chapman "is insured under TIG Policy No. [redacted]. The applicable TIG policy to the Seth claim was effective from October 2, 1999, to October 2, 2000.").

The undisputed evidence establishes that Seth's claim against Chapman was covered under the 1999-2000 policy and that no reservation of rights letter was issued by TIG relative to the claims asserted in the original complaint. It is undisputed that Chapman provided notice of the claim within the required time period. TIG has acknowledged that the 1999-2000 policy covered the original Seth claim. It arguably appears that the 2000-2001 policy issued by TIG to Chapman would have also covered the Seth claim because Chapman provided notice to TIG of the claim in the re-application for coverage from October 2000-October 2001. The Court finds that as to TIG's assertion that the Seth claim falls outside the terms and conditions of the insuring agreement is devoid of merit. As a matter of law, the Seth claim fell within the coverage period of the 1999-2000 policy issued to Chapman by TIG and arguably within the coverage period of the 2000-2001 policy. The contention that none of the claims asserted by Seth against Chapman are covered claims is devoid of merit.

## IV.     CONCLUSION

For the reasons set forth above, the Court **GRANTS, IN PART,** the Plaintiff's Motion for Summary Judgment (Docket No. 39). The Court expressly finds that the Miller-Shugart settlement agreement and stipulated judgment entered into between Aruna Seth and Charles Chapman on February 11, 2005, is void and unenforceable as a matter of law. The Court further finds that the TIG insurance policies issued to Chapman cover the time period when the Seth claims arose. However, the Court expressly finds that there are genuine issues of material fact as to whether Chapman's actions in entering into a Miller-Shugart settlement agreement constituted a "substantial and material" breach of the insurance contract which equates with a lack of cooperation so as to relieve the insurer (TIG) of liability under the contract. This will be the sole issue for resolution during the court trial currently scheduled to commence on July 25, 2006, in Bismarck.

**IT IS SO ORDERED.**

Dated this 30th day of June, 2006.

/s/ Daniel L. Hovland
Daniel L. Hovland, Chief Judge
United States District Court